WILLIAMS HARVEY CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 19409, 19941, 29697.   Promulgated May 28, 1929.

*Frank S. Bright, Esq.*, and *S. Hinrichs, Esq.*, for the petitioner.
*John D. Foley, Esq.*, and *Lloyd Creason, Esq.*, for the respondent.

### OPINION.

STERNHAGEN: Deficiencies in income and profits tax have been determined by respondent of $24,528.14 for 1919, $1,207.97 for 1921, $7,233.71 for 1922, and $12,184.58 for 1923. The primary claim of petitioner is that its deduction for amortization of war facilities (the amount of which is agreed to be $423,774.40) should be allowed for 1919. Respondent applied $27,505.54 for 1919 and the rest of it for 1918, and at the hearing claimed an increase of the deficiency by retracting the allowance for 1919 and applying it entirely to 1918. For later years petitioner claims the benefits of adjustments in invested capital which follow a favorable decision as to amortization for 1919. Petitioner also claims a deduction for depreciation as an alternative in the event of failure of its claim for amortization.

There is no dispute as to the facts, all of which have been embodied in a written agreed statement as follows:

1. The petitioner is a corporation organized and existing under the laws of the State of New York with its principal office at 111 Broadway, New York City.

2. During 1917, the petitioner commenced the erection of a plant for the smelting of tin ore at Mill Basin, Brooklyn, on a site purchased in March of that year. Said plant was not completed until October 1918 when the smelting of tin ore was commenced and said plant was in use by the plaintiff for the smelting of tin ore until the year 1923 when operations were discontinued in this and all other tin smelters in the United States. Said plant thereafter remained idle until February 1928, when it was sold yielding no more than scrap value for the improvements.

3. Prior to the late war and since 1923, the smelting of tin ore has not been carried on in the United States because practically no ore is mined here and

under ordinary commercial conditions ore cannot be imported and smelted to compete with foreign smelters.

4. The increase in the use of tin because of its war uses produced a scarcity of that article among the warring nations and the American sources of supply were largely controlled by Great Britain prior to the entrance of the United States into the war. In order to prevent tin from reaching the enemies of the Allies, the British government attempted to control the use of all tin imported into the United States by preventing shipments of tin into the United States except such as were consigned to the British consul at the port of destination. Before delivery of such tin into the United States, the holders of ˙all bills of lading were required by the British consul to give assurances as to its use and that it would not in any way be delivered to persons who were enemies or citizens of a country which was an enemy of Great Britian. Tin was in such demand in 1916 that when Germany sent its submarine Deutschland to the United States in August, 1916, for war essentials its return cargo consisted entirely of rubber, nickel and tin. Tin was a necessary component of very many of the articles without which no country could have carried on the war. Thus, the chief use for tin is in the manufacture of tin plate which was a war essential for packing food for shipment as well as preservation at home. Next in volume is its use in solder which is necessary in the manufacture of various war essentials. Large quantities of tin are used in making Babbitt metal and bearing metals which enter into the construction of aircraft, submarines, engines and machines. Tin goes into brass which is necessarily used in the construction of cartridges and other munitions. It also goes into bronze used in the construction of submarines, railroad car bearings and other war appliances and in certain war munitions. Tin was used also in the war in the production of smoke screens for infantry attacks. Tin oxide is required in the manufacture of glass, rubber, tin foil, collapsible tubes and enamel. Tin tetrachloride is used in dyeing silks to give them weight and setting the colors.

5. Uses of tin in the United States for the year 1917, as computed by the War Industries Board were as follows:

| | Long tons | Per cent |
|---|---|---|
| Tin and terne plate | 27,600 | 36.20 |
| Solder | 17,000 | 22.30 |
| Babbitt and other bearing metals | 10,800 | 14.16 |
| Brass and bronze | 4,800 | 6.29 |
| Collapsible tubes | 2,100 | 2.75 |
| Foil | 4,000 | 5.24 |
| White metal | 1,750 | 2.30 |
| Tinning and retinning | 1,900 | 2.50 |
| Chemicals | 1,700 | 2.22 |
| Plated ware, britannia ware, etc | 1,000 | 1.31 |
| Miscellaneous | 3,607 | 4.73 |
| Total | 76,257 | 100.00 |

6. Tin and tin products were practically excluded from export from the United States during the World War and the problem of securing sufficient importation and suitable distribution was a serious one.

7. In December 1917, the War Trade Board appointed the American Iron and Steel Institute sole consignee for all pig tin, tin ore and tin chloride imported into this country and the tin was to be released to importers upon their giving such guarantees or agreements as the War Trade Board required.

8. The tin section of the War Industries Board was organized March 6, 1918, and during the rest of the war with Germany it was in control of the distribution as well as the acquisition of this country's supply of tin. Thereafter, consumers, jobbers and dealers were required to file applications stating the quantity and brand of tin, the use to which it was to be put and the time during which it would be consumed. They had to pledge not to sell without express permission of the War Industries Board, but licenses were not required for purchase of less than five (5) tons.

9. In August, 1918, by agreement between the United States, Great Britain, France and Italy, an interallied tin executive was established in London and thereafter said executive controlled and directed all purchases of pig tin for the participating countries, and import licenses were granted only for tin purchased by the tin executive.

10. In September, 1918, the War Industries Board requested the American Iron and Steel Institute to assume charge of the importation, financing, and distribution of the imports of pig tin under its supervision, and the United States Steel Products Company was made a medium through which the work was carried out.

11. On April 10, 1918, when the petitioner's plant was in the course of construction, George Armsby, chief in charge of tin raw material division, War Industries Board, wrote the United States Fuel Administration:

"As you no doubt know, this country will require about one hundred million dollars worth of tin this year, practically all of which has to be imported. The bulk of these importations come in the shape of pig tin, but there has recently been constructed in this country two (2) tin smelters of quite considerable proportions, who will import tin concentrates direct from Bolivia. I consider it to be of the utmost importance in our conduct of the war to encourage in every possible way the operation to the maximum of capacity of these tin smelters, one of which is operated by the American Smeltering and Refining Company at Perth Amboy, N. J., and the other to be operated by the William Harvey Corporation at Flatland, Jamaica Bay, L. I. I recommend and urge that you give these smelters every possible preference to insure their maxim operation so far as supply of fuel is concerned. I am taking up with Mr. Edward Chambers, director of division of traffic, the matter of furnishing cars in this connection."

In the letter of said Armsby to said Chambers dated April 13, 1918, he stated:

" In further reference to assisting the two (2) plants in this country to smelt tin concentrates * * * if you will expedite the forwarding of this equipment in every way within your power I will be very appreciative. We do not want one unnecessary day's delay in getting the Williams Harvey Corporation plant in operation."

12. On September 24, 1918, the petitioner entered into a firm contract with La Compania Estenifera de Llallagua of Valparaiso, Chile, for the purchase of six hundred (600) tons of tin ore concentrates monthly for the term of two (2) years commencing October 1, 1918.

13. Following the construction of said plant, the petitioner made several importations of tin ore concentrates under licenses granted by the War Trade Board. The applications for said importations were as follows:

1. Dated May 28, 1918 (continued for a period of three months) under date of August 22, 1918 for five hundred (500) gross tons, granted October 25, 1918,

2. Dated Nov. 19, 1918, granted Nov. 20, 1918, 600 gross tons.

3. Dated Nov. 2, 1918, granted Nov. 20, 1918, 600 gross tons.

4. Dated Nov. 2, 1918, granted Nov. 20, 1918, 1800 gross tons.

5. Dated Jan. 27, 1919, granted ———, 600 gross tons.

6. Dated Jan. 27, 1919, granted ———, 1800 gross tons.

7. Dated May 29, 1919, granted ———, 600 gross tons.

8. Dated June 24, 1919, granted ———, 600 gross tons.

9. Dated July 3, 1919, granted July 7, 1919, 600 gross tons.

In each of these applications, the American Iron and Steel Institute was named as the consignee except Number 2, in which the United States Steel Products Company is named as the consignee.

14. It is not claimed that the petitioner did not at all times endeavor to comply strictly with the law and the regulations of the War Trade Board and the War Industries Board with reference to the importation and distribution of tin. Practically all of the petitioner's output was sold to the National Lead Company, a licensee of the War Industries Board, and in strict accordance with the law and government regulations. As late as April 7, 1919, however, the plaintiff was warned by the War Industries Board that " all sales of tin in lots of five (5) gross tons and over and from whatever sources, are strictly prohibited except to holders of purchase licenses issued by the War Industries Board." On August 15, 1919, the War Industries Board released the petitioner and others from the necessity of requiring licenses from purchasers of tin products and from and after that date the petitioner was not required to procure a license to import its tin ore concentrates.

15. The smelting facilities used by the Company in 1919 cost $663,026.75 as follows:

Expended in 1917_____ $294, 044. 98

Expended in 1918_____ 341, 753. 76

Expended in 1919_____ 45, 352. 85

For the purposes of this suit the parties hereto agree that the petitioner is entitled to an allowance on account of the amortization of said facilities under Section 234(a)(8) of the Revenue Act of 1918, in the amount of $423,774.40, but the parties are not in agreement as to the year or years in which said deduction should be made in computing the petitioner's net income for federal income tax purposes under said Revenue Act. The Commissioner of Internal Revenue has allowed a deduction of $27,505.54 for the year 1919, all of the rest of said allowance being assigned to the year 1918, during which petitioner received no net income.

16. The net incomes of the petitioner (without any deduction on account of depreciation or amortization) for the years involved in this proceeding were as follows:

1918_____ None.

1919_____ $799, 397. 10

1920 (loss)_____ 224, 702. 24

1921_____ 59, 955. 61

1922_____ 318, 335. 48

1923_____ 140, 431. 73

17. The following are the assessments of taxes and the deficiencies proposed:

| | Taxes assessed | Deficiencies proposed |
| --- | --- | --- |
| 1918_____ | None. | None. |
| 1919_____ | $267, 003. 95 | $23, 124. 88 |
| 1920_____ | None. | None. |
| 1921_____ | None. | 1, 207. 97 |
| 1922_____ | 13, 810. 39 | 7, 233. 71 |
| 1923_____ | None. | 12, 184. 58 |

The items of plant equipment covered by the amortization allowance are as follows:

| | Cost 1917 | Cost 1918 | Cost 1919 |
|---|---|---|---|
| Buildings | $175, 578. 30 | $30, 909. 11 | $3, 439. 91 |
| Office Equipment | | 1, 977. 41 | |
| Yard Property | 4, 606. 00 | 32, 335. 61 | 275. 00 |
| Yard Machinery | 8, 039. 00 | 6, 071. 46 | |
| Machinery & Equipment discarded in 1918–1920 | 27, 286. 12 | 114, 078. 97 | 24, 234. 41 |
| Operating Furnaces | 44, 384. 40 | 36, 627. 53 | 1, 139. 36 |
| Boilers, Tanks, etc | 11, 892. 81 | 56, 682. 55 | 1, 939. 20 |
| Machinery & Equipment General | 21, 928. 75 | 37, 877. 55 | 13, 383. 29 |
| Miscellaneous Equipment | | 5, 628. 51 | |
| Shop Machinery & Equipment | | 1, 493. 80 | |
| Power & Electrical Equipment | 329. 60 | 18, 071. 26 | 941. 68 |
| Total | 294, 044. 98 | 341, 753. 76 | 45, 352. 85 |

It is further agreed that the Bureau has determined that the annual rates of depreciation, where depreciation is applicable on said items of equipment, are as follows:

Buildings, 5%; Yard Property, 5%; All others, 10%.

18. The plant as originally built was found to operate very unsatisfactorily and considerable changes and improvements were made in the plant (including a new method for the recovery of bismuth, a by-product). The Company made expenditures for said changes (not used until after 1919), as follows:

In 1919 _____ $91, 196. 03
In 1920 _____ 186, 743. 83

The Commissioner has allowed depreciation upon the expenditures set forth in this paragraph.

19. The said expenditures were all for depreciable assets and they are in addition to the items upon which it is agreed that petitioner is entitled to an amortization allowance. The cost less amortization at the end of 1919, of the amortized assets, and the cost of the said new assets, are as follows:

| | Cost less amortization | Cost 1919 | Cost 1920 |
|---|---|---|---|
| Buildings | $120, 695. 05 | $1, 880. 36 | $38, 636. 92 |
| Office Equipment | 1, 097. 51 | 1, 402. 05 | |
| Yard Property | 16, 230. 26 | 7, 749. 30 | 20, 763. 68 |
| Yard Machinery | 5, 183. 10 | 5, 538. 67 | |
| Machinery & Equipment | 15, 738. 33 | 969. 28 | 305. 96 |
| Operating Furnaces | 29, 079. 84 | 67, 312. 01 | 37, 006. 24 |
| Boilers, tanks, etc | 27, 476. 00 | 732. 47 | 1, 062. 84 |
| Machinery & Equipment General | 28, 982. 89 | | 86, 588. 43 |
| Miscellaneous Equipment | 2, 218. 51 | | |
| Shop Machinery & Equipment | 1, 088. 00 | 578. 21 | 146. 02 |
| Power & Electrical Equipment | 9, 587. 70 | 5, 033. 68 | 2, 233. 74 |
| Total | 257, 377. 19 | 91, 196. 03 | 186, 743. 83 |

It is agreed by the parties hereto that the Commissioner has determined that the annual rates of depreciation allowable, where depreciation is applicable upon the above items of equipment, are as follows: Buildings, 5%; Yard Property, 5%; All others, 10%.

20. The petitioner filed with the Internal Revenue Bureau on or about November 14, 1923, a claim for refund for income and excess profits taxes erroneously paid for the year 1919 in the amount of $219,331.71 on the ground that it was entitled to an amortization allowance. Said claim was rejected by the Commissioner under date of. June 19, 1926.

The terms of the contract referred to in paragraph 12 have not been set forth because they have not been deemed essential to a clear report of the proceeding.

The petitioner claims under the Revenue Act of 1918, section 234(a) (8) set forth in the margin.[1] It is agreed that the petitioner is entitled to an allowance under this section of the amount of $423,-774.40, so that all the factors of the statute which affect the quantum of recovery of its investment in war facilities through the amortization allowance are beyond review. The question to be decided is whether the petitioner, upon the stipulated facts, is entitled to a deduction of all or any part of the agreed amount in 1919.

Where a taxpayer in 1918 invested in war facilities which were never used for purposes related to the war or to produce so-called war income, it was held in *John Polachek*, 8 B. T. A. 1, that no amortization allowance could be deducted from the ordinary peacetime gross income of later years, because the purpose of this extraordinary deduction was one of relief from the burdens of extraordinary war income. *Walcott Lathe Co.*, 2 B. T. A. 1231. It was clearly recognized, however, as it had been in *G. M. Standifer Construction Co.*, 4 B. T. A. 525, that war burdens might carry on after the Armistice of 1918, although this was not true in fact in the *Polachek* case. Whether in any case the deduction for amortization of the cost of war facilities is to be applied in one year or another or several depends upon the factual relation between the income taxed and the war burdens.

The war facilities of the petitioner were placed in operation in October, 1918. So far as the record shows, they were not suitable for peace-time business because the smelting of tin ore could not be economically done in this country under ordinary circumstances. While there seems to have been some use of the facilities until 1923

[1] (8) In the case of buildings, machinery, equipment, or other facilities, constructed, erected, installed, or acquired, on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war, and in the case of vessels constructed or acquired on or after such date for the transportation of articles or men contributing to the prosecution of the present war, there shall be allowed a reasonable deduction for the amortization of such part of the cost of such facilities or vessels as has been borne by the taxpayer, but not again including any amount otherwise allowed under this title or previous Acts of Congress as a deduction in computing net income. At any time within three years after the termination of the present war the Commissioner may, and at the request of the taxpayer shall, reexamine the return, and if he then finds as a result of an appraisal or from other evidence that the deduction originally allowed was incorrect, the taxes imposed by this title and by Title III for the year or years affected shall be redetermined and the amount of tax due upon such redetermination, if any, shall be paid upon notice and demand by the collector, or the amount of tax overpaid, if any, shall be credited or refunded to the taxpayer in accordance with the provisions of section 252.

which brought in taxable income, this has apparently been adjusted satisfactorily to the parties in computing the stipulated amount of amortization. The only evidence of the duration of the results of the war consists of the contract for the purchase of supplies over a term until October 1, 1920, and the continued supervision of the War Industries Board, which was last exercised by the release of August 15, 1919. We think therefore that the period should include that of performance of the supply contract, which would go to October 1, 1920.

In *Standifer Construction Co.*, *supra*, and *American-Hawaiian S. S. Co.*, 7 B. T. A. 13, it was held that the amortization allowance where spread over a period of more than one year should be apportioned in accordance with the net income. Here, there was no net income of 1918 and none for 1920 and, hence, the allowance falls entirely in 1919.

The deficiencies should be redetermined accordingly.

*Judgment will be entered under Rule 50.*